[File No. 6223.]

A. W. PAUL, Respondent, v. ST. PAUL FIRE & MARINE INSURANCE COMPANY, a Corporation, et al., and ST. PAUL FIRE & MARINE INSURANCE COMPANY, a Corporation, Appellant.

(253 N. W. 752.)

480

Opinion filed March 24, 1934.

*Nilles, Oehlert & Nilles,* for appellant.

*Pierce, Tenneson, Cupler, & Slambaugh,* for respondent.

BURKE, J. The plaintiff had an insurance policy insuring certain buildings on his farm against loss by fire or lightning. The policy limits the amount of recovery to the actual value of the property at the time any loss or damage occurs and in no event to exceed what it would cost to repair and replace the same. It has a lightning clause and a provision that in no case shall it include damage or loss by cyclone, tornado or windstorm. The policy covered a silo which was insured for $750.00. The plaintiff claims that on the 6th day of June, 1932, the silo was struck by lightning and split in two. That prior to the destruction of the silo it was of the actual cash value of $1,100.00. The insurance company answered denying damage by lightning and alleging that any loss or damage was due to causes not insured against by the terms of the policy. At the close of all of the testimony the defendant moved for a directed verdict, which was denied and thereafter the defendant moved for judgment notwithstanding the verdict or for a new trial, which motion was overruled and the defendant appealed from said order and from the judgment entered upon the verdict.

In the late afternoon of the 6th day of June, 1932, the plaintiff states "A cloud came up from the southwest, and I was working in the field at the time. It came up quite rapidly, and I started homeward, and on my way home several crashes of lightning occurred, and by the time I reached the barn and just got my horses in the stalls, a terrific crash occurred, that blinded me, and there was a noise on the south end of the barn, and then immediately after the noise we heard on the south end of the barn there was a rumbling noise. It sounded like something hit the roof. I went to the south end of the barn, the door was open, and I discovered the silo was split open. It was split right down through the center. I made an examination of the

silo. I found a bolt that had been melted off of the foundation. The bolt was used to anchor down the silo on the foundation. I found it right near the split of the silo. I sawed off the small piece which was in the foundation. There was some wind, but not strong. In going to the barn from the field there was no wind. I went to the south door and looked out and saw this silo. There was a breeze at that time but not a very strong wind. The small sheep troughs, I saw the next morning, they were made of light material and were not moved or disturbed in any way. The silo was empty, was in good condition and had never suffered any damage prior to that time. It was five or six years old. It was worth not less than $900.00. I used the old foundation when it was rebuilt. I would judge that it would not be worth over $100.00. I used some of the old material and the material and labor of rebuilding cost $642." On cross examination he testified that "at first I thought it was the wind and I told Mr. Bailey the next day that the wind had split the silo. I told him I was going to report it to the company that had built the silo as they had guaranteed it against wind. It was the next day that I saw Bailey. I did not ask Bailey to send in notice of wind loss. I left Mr. Bailey and went over to Kapaun Brothers. About ten minutes afterwards I returned to Bailey. He let me know right away before I left him that I did not have any windstorm insurance."

"Q. It was after that you had him send in notice of loss by lightning. ?"

"A. Yes, sir."

"The top of the silo is 16 feet in diameter. It landed on the south end of the barn and came to rest on the northwest corner. It just rolled on the barn. The marks are still on the roof. It didn't go the length of the barn north and south; it rolled kitty-corner kind of in a circle. There was a little wind.

"Q. When you say a little wind, it was a considerable wind, was it not?

"A. No, no unusual wind. Nothing out of the ordinary. It did not move anything in the yard. The top struck the hip of the barn and rolled over that. There were a few doors opened in the chute on the north side and the window in the roof was open. The silo was 38 feet high. My conclusion that the wind blew the silo down was

based on the fact that there was a wind, but there was considerable doubt in my mind at the time.

"Q. And that ten minutes or so you talked with somebody else was the time you changed your mind?

"A. Yes, sir, it was.

"Q. Mr. Paul, it is a fact that you made a claim to the insurance company that it was the wind that blew down the silo?

"A. No, sir. Never made no such claim.

"Right at the time it entered my mind that the lightning had done it, but when it did not burn down I assumed that it was the wind." On redirect examination "I first thought that it was the lightning but since the silo did not burn down I dismissed that thought."

John Norton was working for the plaintiff at the time and he testified that "about 5:30 I started to milk the cows, . . . there was a loud crash of thunder, and then there was another awfully loud crash, with lightning, followed pretty soon after. I got up from under the cow, and walked to the front door. I was scared. I said, 'My God, that was awfully close.' Mr. Paul went to close the back door, and he saw the silo was down. He saw that the silo was torn apart. I did not notice or hear any strong wind. There were some light sheep troughs outside that were not fastened to the ground and not disturbed. I heard the crash and heard something going. I thought it was the barn. Found it was the top of the silo.

"Q. Well didn't you hear this top of the silo bump on the roof?

"A. I didn't know what it was. I heard the crash, and I got up from under the cow and went to the front door."

The other neighbors testified as to the electrical storm but none of them testified as to any unusual wind.

It is the contention of the defendant that the evidence is insufficient to justify the verdict, and this contention is based on the testimony of the plaintiff. No one saw the lightning strike the silo and the plaintiff first thought that the damage was caused by the wind; that he told Mr. Bailey and admitted on the stand that his first impression was that it was caused by the wind. The plaintiff, as a witness, was apparently very candid, admitting that he first thought it was the wind; that he told Bailey that he thought it was the wind. He states that his first impression at the time of the crash was that it was

the lightning but when he saw the silo and there was no fire, then he thought it must have been the wind. His testimony and Norton's testimony is that immediately after the lightning they heard something strike the roof. Norton thought it was the barn that had been struck but he heard the noise on the roof immediately after the lightning and the plaintiff heard it strike and then heard a rolling along the roof. The photograph of the barn and silo shows that the silo is right against the southwest corner of the barn. There is a gambrel roof on the barn and the place marked with the arrow on the roof where the top of the silo struck is right at the hip of the roof. The top of the silo was round and it struck right where the roof is very steep. It would naturally roll on this steep roof and gather momentum until it reached the roof on the lean-to which is not so steep and which might account for the distance that the top of the silo rolled. The small window in this top was open on the south side and a few doors open in the chute on the north side, the door to the barn, that the plaintiff came to when he saw the silo, was also open and nothing was disturbed. The barn has a cupola, which was not disturbed. It would seem that nothing less than a cyclone or tornado could split the silo from top to bottom. A straight wind might blow it over and if it was a cyclone or tornado it would have torn the barn to pieces.

Counsel relies upon the case of Warmcastle v. Scottish Union Nat. Ins. Co. 201 Pa. 302, 50 Atl. 941. But in this case the testimony shows some injury by lightning and that great damage was caused by the wind. In construing a lightning clause in the policy similar to the policy in the instant case the court said: "The defendant's counsel presented three points for charge, which sought to confine the verdict of the jury to the direct damage caused by the lightning, exclusive of that caused by the wind. These points were refused by the court, and the jury were instructed that they might take into consideration not only the effect of the lightning but the subsequent injury by the wind." This was held to be error. The case was before the supreme court again and is reported in 210 Pa. 362, 59 Atl. 1105, and the court said: "The only question now before us is whether the jury had sufficient evidence to enable them to make the distinction. We are of the opinion that they had. At least one witness testified

that the flash of lightning and the fall of the sidewall were simultaneous and another testified to the same thing as to the roof, with the further facts that the materials fell outwards towards the wind. It was a fair inference that the damage came directly from the lightning and only a jury could draw it."

In the instant case the court gave the instructions which were refused in the Warmcastle case at the first trial. In the instant case the jury was instructed as follows: "If you should find from the evidence in this case that the destruction or damage to the silo was caused by lightning and by a windstorm acting together, then it will be your duty to determine separately the amount of damages caused by lightning, and the amount of damages caused by the windstorm, and to award the plaintiff only such portion of the total damage as you find was caused by lightning alone." Again "You are instructed that if the jury believe under the evidence that the damage was caused by lightning and wind acting together, and if you cannot determine by the evidence how much damage was done by lightning, and how much damage was done by wind, and are unable to separate the items of damage done by these two different elements, then you are instructed that it is your duty to return a verdict for the defendant since the burden is upon the plaintiff to prove not only the cause of the loss but also the amount of damage resulting from such cause."

These are the same instructions that were asked for and refused in the first trial of the Warmcastle case. Indeed the appellant claims that the verdict is against the law as given by the judge in the instructions quoted. Now in the Warmcastle case it is stated that the testimony seemed to show some injury by lightning and that great damage was also caused by the wind. In the instant case there is no evidence of any wind causing damage. All of the witnesses in the neighborhood testified as to the severity of the electrical storm and they all say that there was no unusual wind and that there was no damage to anything in the neighborhood from wind. There was no damage to any of the buildings or any of the equipment on the plaintiff's farm, except the silo.

Appellant's contention that the silo was destroyed by the wind rests upon statements made by the plaintiff to Mr. Bailey, that he thought it was the wind that split the silo and his testimony on the stand that

he first thought it must be the wind, but Mr. Bailey testified as follows:

"Q. When Mr. Paul told you the wind had damaged his silo, didn't you say that was strange, there wasn't any wind in Alice?

"A. I believe I did. . . .

"Q. He wasn't talking to you about insurance at all when he was first talking to you, was he?

"A. No.

"Q. And it was only after he came back on this second visit that he asked you to report any loss to the company, is that correct?

"A. Yes."

So the statement made by the plaintiff that he thought it was the wind does not rest upon any facts and is explained in plaintiff's statement that he thought it must be the wind when there was no fire. There is no evidence of any destructive or unusual wind, but there is evidence that immediately after the terrific flash of lightning they heard a noise on the roof of the barn and then a rumbling across the roof, so it might be said that the noise on the roof was simultaneous with the flash of lightning.

The question of what caused the destruction of the silo was a question for the jury and there is evidence which sustains their verdict. See also Roth v. South Easthope Farmers Mut. F. Ins. Co. (1917) 41 Ont. L. Rep. 52; Reischer v. Borwich [1894] 2 Q. B. 548—C. A.; Pink v. Fleming, L. R. 25 Q. B. Div. 396—C. A.; Dudgeon v. Pembroke, L. R. 9 Q. B. 581, L. R. 1 Q. B. Div. 96, L. R. 2 App. Cas. 284, 14 Eng. Rul. Cas. 105—H. L.; Davidson v. Burnand, L. R. 4 C. P. 117, 121.

It follows that the court did not err in denying the motion for a directed verdict. Appellant assigns as error the following:

"Mr. Stambaugh: Showing you plaintiff's Exhibit C, I will ask you if that is approximately a correct picture or representation of the condition of the silo on the morning after the storm? A. Yes, sir.

"Mr. Nilles: We object to this as calling for a conclusion of the witness. . . .

"The Court: Overruled."

Exhibit C. was a photograph of the silo taken after the storm. The plaintiff had the silo built, had used it for five or six years, knew the condition that it was in before the storm, knew the condition that it

was in after the storm and certainly did know whether the photograph showed the condition of the silo on the morning after the storm. There was no error in overruling the objection.

"Mr. Stambaugh: Q. I will also ask you, Mr. Paul, if that was the condition that silo was in for several days after the storm? A. Yes, sir."

"Q. Just as it shows in the picture, plaintiff's exhibit C? A. Yes, sir."

This testimony was offered without objection. The objection is to the introduction of the exhibit. Since it was a photograph of the condition of the silo the morning after the storm, it was competent testimony and there was no error in receiving it in evidence.

"Mr. Stambaugh (in inquiring about the silo after the storm said): Q. What did you find? A. I found a bolt that had been melted off of the foundation."

A motion to strike out the answer as calling for a conclusion was denied. That part of the answer "I found a bolt" in connection with the preceding testimony was competent and if the motion had been confined to the last part of the answer, namely: "that had been melted off of the foundation" doubtless this part of the answer would have been stricken out. The motion is too broad in asking to strike out the whole answer and the denial of the motion was not error.

The two pieces of the bolt, after it had been shown that one of them had been sawed off the foundation right at the place where the split was in the silo, was offered in evidence and objected to on the ground that the evidence does not establish the existence of any casualty covered by the insurance policy. We have held that there is evidence of damage by lightning and there is no error in overruling the objection.

It is claimed that the court erred in overruling defendant's objection to the question:

"Q. Did you sit down and figure out this thing with a lot of deliberation? A. No, sir."

This question might well have been omitted, but do not see how the defendant is prejudiced by the answer.

It is claimed that the Court erred in refusing defendant's instruction No. 3, to-wit: "You are instructed that if you find from the

evidence that the lightning struck the silo, and that the wind came on and also did some damage, the jury must confine their verdict to the actual damage caused by the lightning and cannot include in such verdict any damage which might have been done by the wind."

Instead of giving this instruction the court gave the following: "If you should find from the evidence in this case that the destruction or damage to the silo was caused by lightning and by a windstorm acting together, then it will be your duty to determine separately the amount of damages caused by lightning, and the amount of damages caused by the windstorm, and to award to the plaintiff only such portion of the total damage as you find was caused by the lightning alone." The court follows this up with another instruction already quoted, that in case they could not determine the damage caused by lightning and the damage caused by the wind, they must find for the defendant. The court also instructed the jury as follows: "You are instructed that before the plaintiff can recover in this action you must be satisfied by a fair preponderance of the evidence, that lightning was the direct cause of the damage and loss to the silo. If you believe from the evidence that the silo was not damaged or destroyed by lightning, then your verdict should be for the defendant. Under the insurance policy involved in this action the plaintiff cannot recover if the loss or damage to the silo was caused by a windstorm or a tornado."

In three different instructions the court made it clear to the jury that the plaintiff could not recover for damages caused by the wind or by a tornado or cyclone, and that the jury must be satisfied by a fair preponderance of the evidence that the lightning was the direct cause of the loss. The instructions given were more comprehensive and certainly as favorable to the defendant as the instruction asked for and refused.

It is claimed that the court erred in giving the following instruction, namely: "If you find from the evidence that the direct and sole cause of the damage to the silo was on account of the lightning, then the measure of damages in this case is the difference in the cash value of the silo immediately before the storm, and the cash value of the same after the storm. In arriving at the amount of damages you may take into consideration the cost and expense of rebuilding and repair-

ing the silo." It is claimed that this instruction is misleading, as the items of expense, in repairing the building, might be in excess of the actual loss. The evidence shows that the actual cash value of the silo before the storm was $900.00 and after the storm it was worth $100.00. The cost of rebuilding the silo was $642.00. The policy provides "This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, . . . and shall in no event exceed what it would then cost the insured to repair or replace the same. . . ." These provisions are in the policy for the benefit of the defendant and the defendant would have a right to show the cost of rebuilding for the purpose of fixing the maximum liability of the company. The evidence of cost of rebuilding was offered by the plaintiff and if the court had not given the instruction to the jury that "the measure of damages in this case is the difference in the cash value of the silo immediately before the storm, and the cash value of the same after the storm. In arriving at the amount of damages you may take into consideration the cost and expense of rebuilding and repairing the silo" the verdict would doubtless have been for $750.00, that being the amount for which the silo was insured and the maximum amount the court told the jury they might find.

In the case of Citizens' Sav. Bank & T. Co. v. Fitchburg Mut. F. Ins. Co. 86 Vt. 267, 84 Atl. 970, the court said: "The policy does not make the cost of replacement the invariable test of actual cash value, but limits the recovery in cases where an ascertainment according to actual cash value would exceed that amount. The plaintiff proceeds to make out his case by any evidence which legitimately tends to show actual cash value. The defendant may guard against a possible finding in excess of the cost of replacement by introducing evidence of what that cost would be. But it cannot confine the plaintiff to proof of that character by making the cost of construction the basis of ascertainment."

In the instant case the cost of construction was not made the basis of ascertainment. The court had already stated that the measure of damages was the difference between the cash value of the silo immediately before the storm and the cash value of the same after the storm.

On the facts in this case the instruction was favorable to the defendant. There being no error the judgment must be affirmed.

BURR, Ch. J., and NUESSLE, MOELLRING and CHRISTIANSON, JJ., concur.